CROWELL & MORING LLP
Justin D. Kingsolver (AZ Bar No. 035476)
JKingsolver@crowell.com
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
JKingsolver@crowell.com
Alexander Urbelis (*pro hac vice*)
AUrbelis@crowell.com
590 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 223-4000

CROWELL & MORING LLP
Warrington S. Parker, III (*pro hac vice*)
WParker@crowell.com
Jacob Canter (*pro hac vice*)
JCanter@crowell.com
Katie Lee (*pro hac vice*)
KatLee@crowell.com
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: (415) 986-2800

Attorneys for Plaintiffs ENS Labs, Ltd. f/k/a True Names, Ltd. and Virgil Griffith

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ENS Labs, Ltd. f/k/a True Names, Ltd., a Singapore corporation; and Virgil Griffith, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>GoDaddy, Inc., a Delaware corporation; GoDaddy.com LLC, a Delaware corporation; Dynadot LLC, a California corporation; and Manifold Finance, Inc., a Delaware corporation,<br><br>Defendants. | No. 2:22-cv-01494-JJT<br><br>PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION |

Plaintiffs ENS Labs, Ltd. f/k/a True Names, Ltd. and Virgil Griffith, by and through their undersigned counsel, respectfully move this Court for an Order to enforce the Court's previous Preliminary Injunction Order against Defendant Dynadot LLC ("Dynadot") (Dkt. 19) and to hold Dynadot in contempt. Plaintiffs seek the following relief in this Motion:

    A.    Issue an Order requiring Dynadot to transfer the eth.link domain (the "Domain") to the registrar of Plaintiffs' choice.

B. Order Dynadot to pay Plaintiffs their attorneys' fees and costs incurred in enforcing the Preliminary Injunction Order, in an amount to be determined in a subsequent submission, and hold Dynadot in contempt for violating the Court's Preliminary Injunction Order due to Dynadot violating Plaintiffs' ownership interests in the Domain through the following acts: (1) refusing to allow Plaintiffs to transfer the Domain to a new registrar without justification; (2) refusing to allow Plaintiffs to change any of the settings of the Domain's DNS configuration without justification; (3) suspending the Domain from operation without warning or justification; and (4) refusing to provide Plaintiffs with any assurances against future operational shut-downs without justification.

C. All other appropriate relief as determined by the Court.

## INTRODUCTION

On September 9, 2022, this Court entered a Preliminary Injunction in favor of Plaintiffs, giving Plaintiffs sole right to the eth.link domain. Dkt. 19. Since then, Dynadot has refused to permit Plaintiffs to transfer the eth.link domain to any other domain name registrar. (*See* Declaration of Jacob Canter ("Canter Decl.") ¶ 3, Exhibit A).

Plaintiffs did not raise this issue with the Court until now because the Domain remained operational and Plaintiffs saw no need to rush to court. While Dynadot's stand was a violation of the injunction, the issue was not at that time acute.

That changed in the last 10 days. On March 29, 2023, Dynadot caused the Domain to be offline for over six hours. (*See* Declaration of Nick Johnson ("Johnson Decl.") ¶¶ 2-7). Plaintiffs asked Dynadot for an explanation. Dynadot's response on April 5, 2023, was no better than the worst customer service. Dynadot explained that it shut down the domain due to a complaint. (*See* Canter Decl. ¶ 3, Exhibit A at 1). Yet, the steps it took—shutting down the entire domain—are unjustified.

Then Dynadot ended its message with this: "Dynadot's Terms of Use explicitly state that Dynadot's services are offered on an as-is basis with no commitment to any minimum service level performance, and all warranties are disclaimed." (*See* Canter Decl.

2

¶ 3, Exhibit A at 1). This provides Plaintiffs no assurance that, even without a complaint, the Domain is in safe hands.

Plaintiffs have been patient. They did not pick a fight when they could have only because Plaintiffs hoped that there was no need to bring this motion. Dynadot's cavalier response, non-assurance, and the restrictions it has placed on the Domain, have changed things. Dynadot believes it controls the Domain. It does not.

## FACTUAL BACKGROUND

### A. The Court Entered a Preliminary Injunction that Guarantees Plaintiffs Their Full Ownership Interest in the Domain.

On September 5, 2022, Plaintiffs filed a Complaint and an Ex Parte Motion for a Temporary Restraining Order. *See* Dkts. 1, 2. Plaintiffs sued Dynadot and three other defendants—GoDaddy, Inc., GoDaddy.com LLC, and Manifold Finance, Inc.—for intentional interference with prospective economic advantage and unfair competition, and also sued the GoDaddy defendants for breach of contract and breach of the covenant of good faith and fair dealing. *See* Dkt. 1. Plaintiffs brought the TRO motion on the same counts. *See* Dkt. 2.

On September 9, 2022, this Court issued a Preliminary Injunction against all Defendants. *See* Dkt. 19. The Preliminary Injunction states, in relevant part,

> **IT IS FURTHER ORDERED** that Defendants GoDaddy, Inc., GoDaddy.com LLC, Dynadot LLC, and Manifold Finance, Inc. (collectively, "Defendants"), their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with them, are HEREBY ENJOINED from selling or otherwise transferring ownership interest in the Domain to any party or purchasing or accepting ownership interest in the Domain.
>
> **IT IS FURTHER ORDERED** that, to the extent ownership interest in the Domain has been sold or transferred away from Plaintiffs as the registrants, Defendants shall immediately transfer ownership in the Domain back to Plaintiffs.

*Id.* at 4. Despite this plain language, Dynadot has denied Plaintiffs their ownership interest in the Domain without justification.

**B. Without Justification, Dynadot Places a UDRP Lock on the Domain and Restricts Plaintiffs' Ability to Configure and Use the Domain.**

After this Court entered the Preliminary Injunction, Plaintiffs created an account on Dynadot's registrar platform so that they could administer the Domain. In December 2022, Plaintiffs identified that Dynadot had placed a "UDRP Lock" on the Domain: (Declaration of Alexander Urbelis ("Urbelis Decl.") ¶¶ 2-3, Exhibit 1).



A UDRP lock is placed onto a domain so that the domain owner cannot transfer the domain to a different registrar when a formal dispute under the Uniform Domain-Name Dispute Resolution Policy ("UDRP") is taking place. *See Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 865 (N.D. Cal. 2012) (explaining that defendant complied with the UDRP by locking the domain names following notice of an alleged trademark claim until receipt of a transfer order), *aff'd,* 737 F.3d 546 (9th Cir. 2013). The Internet Corporation for Assigned Names and Numbers ("ICANN") developed and manages the UDRP process. *See Pocketbook Int'l SA v. Domain Admin/SiteTools, Inc.*, 2021 WL 1422784, at *2 (C.D. Cal. Apr. 13, 2021) ("Since 2000, ICANN has required all global top level domain name registrars to adopt its UDRP as part of every domain name contract."). ICANN prohibits registrars from placing UDRP locks on domains when no UDRP proceeding is taking place. *See* ICANN Rules ¶ 4 (only permitting a lock to be in place after the provider submits a verification request and only if the Registrar has "notif[ied] the Respondent of the [UDRP] proceeding"). [1]

---

[1] Available at https://www.icann.org/resources/pages/udrp-rules-2015-03-11-en.

Given that Dynadot placed a UDRP lock on the Domain, Plaintiffs could not move the Domain to a different registrar. (Urbelis Decl. ¶ 6).

Counsel for Plaintiffs asked counsel for Dynadot to remove the UDRP lock. (Canter Decl. ¶ 3, Exhibit A at 4). Counsel for Dynadot denied that the UDRP lock was in place but admitted that the Domain was placed in a "non-transferrable state." (Canter Decl. ¶ 3, Exhibit A at 4). Counsel for Dynadot stated that "Dynadot[] can change the name servers based on your clients' requests, which can be made directly to Dynadot." (Canter Decl. ¶ 3, Exhibit A at 4).

Counsel for Plaintiffs then told counsel for Dynadot that Plaintiffs "intend to transfer eth[.]link to our own registrar" but are unable to given the lock in place:

> Rather than argue whether Dynadot is or is not in compliance with the Court Order, we intend to transfer eth[.]link to our own registrar. The Dynadot account page, however, clearly states that there is a "UDRP Lock" on the eth[.]link domain. We confirmed this is still the case moments ago. Please remove the lock. If the lock prevents us from transferring—and it does—that is not in compliance with the Court Order.

(Canter Decl. ¶ 3, Exhibit A at 3). Counsel for Dynadot responded: "The Court order does not entitle you to transfer the eth[.]link to your own registrar." (Canter Decl. ¶ 3, Exhibit A at 3). Thus, Dynadot refused to allow Plaintiffs to transfer the Domain to a new registrar.

## C. The Domain Goes Down Without Warning for Over Six Hours, Causing Business and Reputational Injury.

On March 29, 2023, Plaintiffs discovered that the Domain was entirely offline and not operational for approximately 6.5 hours, causing Plaintiffs' customers to lose connectivity to any services or platforms that rely on the Domain. (Johnson Decl. ¶¶ 2-7; Canter Decl. ¶ 3, Exhibit A at 2). This 6.5-hour suspension of service caused Plaintiffs business and reputation injury. (Johnson Decl. ¶¶ 2-7).

Plaintiffs discovered upon investigation that the Domain lost service because the name server ("NS") records had been removed from the Domain's registration information:

5

```
                    --------------------------¶
                    |-|-| eth[.]link |-|-|¶
                    --------------------------¶
                    [-] Registrant Name: REDACTED FOR PRIVACY¶
                    [-] Creation Date: 2017-07-26T19:31:41.508Z¶
                    [-] Registrar: Dynadot, LLC¶
                    [-] Location: Unresolvable¶
                    [-] Host: Unresolvable¶
                    [-] IP Address: Unresolvable¶
                    [-] NS Records: No NS Records¶
                    [-] MX Records: No MX Records¶
                    [-] Certificate Authority: No Certificates¶
```

(Urbelis Decl. ¶¶ 8-9, Exhibit 2). Plaintiffs sought to reconfigure the Domain's settings to restore the NS records but the restrictions that Dynadot placed on the Domain prohibited Plaintiffs from doing so:



(Urbelis Decl. ¶¶ 11-13, Exhibit 3). On further inquiry, Plaintiffs discovered that Dynadot has entirely removed Domain's NS records, causing the Domain to lose Internet connectivity and become inoperable. (Urbelis Decl. ¶¶ 10, 13, Exhibit 3).

6

That afternoon, while Plaintiffs were completing its investigation, the NS records were restored. (Urbelis Decl. ¶ 15). After that restoration, Plaintiffs sought to understand the source of the business interruption and why they could not configure the settings of their own domain through contacting Dynadot's customer service portal. (Urbelis Decl. ¶ 14, Exhibit 4). Plaintiffs were, however, instructed that they must discuss these topics with a Dynadot account representative because technical support was prohibited from helping. (Urbelis Decl. ¶ 14, Exhibit 4; Canter Decl. ¶ 3, Exhibit A at 2).

Counsel for Plaintiffs therefore emailed counsel for Dynadot about the lost NS records, the inability to configure the Domain settings, and downtime that the Domain recently experienced. (Canter Decl. ¶ 3; Exhibit A at 2). Counsel for Plaintiffs specifically asked for answers to the following questions:

> 1) Please explain why the domain was offline and missing name server records for 6.5 hours,
> 2) Please explain why Dynadot's customer service representatives refuse to assist with issues that pertain to the domain, and
> 3) Please explain why Dynadot prohibited Plaintiffs from making configuration changes to the domain.

(Canter Decl. ¶ 3; Exhibit A at 2).

One week later, counsel for Dynadot had not answered Plaintiff's questions. Counsel for Plaintiffs thus emailed counsel for Dynadot again on April 5, 2023, noting again that the "restrictions on our client's ability to configure any DNS settings for eth[.]link are still in place." (Canter Decl. ¶ 3, Exhibit A at 1).

**D. Dynadot Admits that It Shut Down the Domain but Provides No Justification for Doing So and No Assurance that it Will Not Happen Again.**

On April 5, 2023, counsel for Dynadot provided Plaintiffs with the following response:

> As you are aware, Dynadot is a registrar licensed and regulated by ICANN. ICANN requires all registrars to operate aa [sic] abuse receipt and response platform, which Dynadot does via www.dynadot.com/report-abuse.html. On March 29, 2023, Dynadot received two complaints which resulted in the Dynadot agent terminating the NS for the eth.link domain name at 7:22 EST. Later, a senior agent reviewed this ticket and restored the NS at 9:07 EST on

the same day, resulting in about an hour and half of downtime. Dynadot's actions were consistent with ICANN requirements for similarly situated major registrars.

Finally, Dynadot's Terms of Use explicitly state that Dynadot's services are offered on an as-is basis with no commitment to any minimum service level performance, and all warranties are disclaimed.

(Canter Decl. ¶ 3; Exhibit A at 1).

## ARGUMENT

### A. There is Clear and Convincing Evidence that Dynadot Has Violated the Preliminary Injunction.

The Court prohibited Dynadot "from selling or otherwise transferring ownership interest in the Domain to any party or purchasing or accepting ownership interest in the Domain" and ordered Dynadot to "immediately transfer ownership in the Domain back to Plaintiffs." Dkt. 19 at 4. Despite this Court order, Dynadot has taken three acts that deny Plaintiffs their ownership interest in the Domain:

***First***, Dynadot refuses to allow Plaintiffs to transfer the Domain to another registrar. Dynadot achieves this by keeping the UDRP lock on the Domain. *See Petroliam*, 897 F. Supp. 2d at 865 (explaining that defendant complied with the UDRP by locking the domain names following notice of an alleged trademark claim until receipt of a transfer order). Despite Plaintiffs providing direct evidence of a UDRP lock on the Domain, Dynadot states that no UDRP lock is in place. (*See* Urbelis Decl. ¶¶ 2-5, Exhibit 1). Dynadot, however, does admit that it has set the Domain to a "non-transferable state," and refuses to change that state. (*See* Canter Decl. ¶ 3, Exhibit A at 4).

Dynadot knows that the UDRP lock prohibits Plaintiffs from transferring the Domain to a new registrar, but insists that "[t]he Court order does not entitle you to transfer the eth[.]link to your own registrar." (Canter Decl. ¶ 3, Exhibit A at 3). This however is false. A basic right to ownership interest in a domain is the right to transfer the domain to any registrar that the domain owner sees fit. *See, e.g., Leo India Films Ltd. v. GoDaddy.com LLC*, 2022 WL 836812, at *2 (D. Ariz. Mar. 21, 2022) (holding that

8

1  defendant impaired plaintiff's ownership rights by locking the domain without
2  justification and preventing its transfer); *Dent v. Lotto Sport Italia SpA*, 2020 WL
3  1170840, at *13 (D. Ariz. Mar. 11, 2020) (ordering that the domain names "shall remain
4  registered with the Plaintiff" and "shall be unlocked/reactivated for Plaintiff's lawful
5  use"); *Pakter v. Dunne*, 2020 WL 3050573, at *9 (D. Ariz. June 8, 2020) (noting that "any
6  injunction ordering the registrar to unlock the Domain would be accompanied by an
7  injunction to immediately transfer the Domain Name to Plaintiffs"); *Randazza v. Cox*, 920
8  F. Supp. 2d 1151, 1159 (D. Nev. 2013) (explaining that a registrar's transfer locks are
9  unnecessary after the domain names are transferred to plaintiffs). Dynadot's conduct
10 directly impinges this right without any justification.

Also, Dynadot has no right to place a UDRP lock on the Domain because no UDRP proceeding is taking place. *See* ICANN Rules ¶ 4. Dynadot's failure to comply with the ICANN rules governing the treatment of domain owners violates Plaintiffs' ownership interest in the Domain. *See Pocketbook Int'l SA*, 2021 WL 1422784, at *2 ("Since 2000, ICANN has required all global top level domain name registrars to adopt its UDRP as part of every domain name contract.").

***Second***, Dynadot refuses to allow Plaintiffs to configure the Domain's basic and essential settings, and refuses to provide a justification for doing so. Plaintiffs lack a complete ownership interest in the Domain if they cannot make settings changes that impact how the Domain operates—for example, updates to the NS records that impact whether the domain is operational, changes to mail server records (a/k/a MX records) that affect whether the domain can send or receive email communications, or alterations to the privacy settings that impact whether third-parties can know sensitive information about the domain's owner. *See, e.g., Leo India Films*, 2022 WL 836812, at *2 (holding that defendant impaired plaintiff's ownership rights by locking the domain without justification and preventing its transfer). Plaintiffs asked Dynadot why it has been prohibited from making these changes, and Dynadot refused to provide a response. *See* Factual Background, § C-D.

9

***Third***, Dynadot refuses to allow Plaintiffs to predictably operate the Domain as part of its business without the fear of interruption and downtime. Plaintiffs lack a full and undisturbed ownership interest in the Domain if the Domain's service can be unilaterally interrupted without notice or justification. *See Leo India Films*, 2022 WL 836812, at *2 (holding that defendant impaired plaintiff's contractual rights by locking the domain without justification and preventing its transfer); *Dent*, 2020 WL 1170840, at *13 (ordering that the domain names "shall remain registered with the Plaintiff" and "shall be unlocked/reactivated for Plaintiff's lawful use"); *Pakter*, 2020 WL 3050573, at *9 (noting that "any injunction ordering the registrar to unlock the Domain would be accompanied by an injunction to immediately transfer the Domain Name to Plaintiffs"); *Randazza*, 920 F. Supp. 2d at 1159 (explaining that a registrar's transfer locks are unnecessary after the domain names are transferred to plaintiffs).

Dynadot's explanation for why the Domain lost operation for 6.5 hours lacks credibility.

It lacks credibility because the Domain was not down from 7:22 EST to 9:07 EST (1 hour, 45 minutes). Rather, the Domain was down for approximately 6.5 hours. (*See* Johnson Decl. ¶¶ 2-7).[2]

The explanation also lacks credibility because Dynadot says that it shut down the Domain because it is regulated by ICANN and received two anonymous complaints on March 29, 2023. *See supra* Factual Background, § D. But ICANN does not require registrars to shut down domains on the same day that anonymous complaints are received.[3]

---

[2] To be sure, it is possible that Dynadot did replace the NS records after approximately 1 hour and 45 minutes, but the effects of replacing the NS records did not propagate through the internet for another approximately 4 hours and 45 minutes, causing the experience for Plaintiffs that the Domain was not operational for 6.5 hours. Dynadot is fully aware that domain configuration changes can take several hours to propagate across the internet. *See e.g.* Dynadot Community Forum, at https://www.dynadot.com/community/forums/f7-domain-name-help/my-domain-name-have-not-resolve-after-several-hours-10676.html (where "teamdynadot" states "[d]omain propagation can take anywhere from 5 minutes to 48 hours. Changing these settings right after previous change will have an effect on that propagation time.").

[3] *See* ICANN Contractual Compliance Complaint Forms, available at https://icannportal.force.com/compliance/s/abuse-domain (ICANN "requires registrars to

1  Moreover, it takes most registrars over three days to respond to abuse complaints, let alone
2  two hours.[4] Also, Dynadot's response to these anonymous abuse complaints was extreme
3  – *i.e.*, removing all Internet connectivity to the Domain – and Dynadot took this drastic
4  measure unilaterally, with no notice to Plaintiffs, and no opportunity to be heard.

Finally, Dynadot cannot justify shutting down the Domain based on a UDRP proceeding, as no UDRP proceeding is currently in place. *See supra*, Argument § A.

Dynadot has continued to violate both the explicit language and the spirit of the Court's Preliminary Injunction. Allowing Dynadot to continue to do so would not only render the Preliminary Injunction meaningless but would result in further harm to Plaintiffs. Dynadot's violations of the Preliminary Injunction are not merely technical or inadvertent, but instead are intentional violations of the Preliminary Injunction's most fundamental prohibition—unauthorized control of the eth.link domain. *See, e.g.*, *MVC Techs. USA Inc. v. Kendrick*, 2019 WL 9598365 (D. Ariz. Oct. 15, 2019) (granting plaintiff's motion to enforce a preliminary injunction and awarding sanctions).

### B. The Court Should Award Compensatory Sanctions.

Compensatory sanctions are also appropriate here because Dynadot's misconduct has caused Plaintiffs to suffer actual out-of-pocket losses in the form of their attorneys' fees to bring this motion that should not have been necessary but for Dynadot's actions. Compensatory contempt sanctions must be based on "actual losses sustained as a result of the contumacy." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983). Here, Dynadot's misconduct caused Plaintiffs to also suffer reputational harm as a result of Dynadot's suspension of operation of the domain because the domain being offline directly impacts ENS' users. (Johnson Decl. ¶¶ 2-7).

---

take reasonable and prompt steps to investigate and respond to abuse reports ***but does not require them to take any specific action on domain names (e.g. suspension or deletion) in response to abuse reports***.") (emphasis added).

[4] *See e.g.* ZDNet, "Web hosting providers take three days, on average, to respond to abuse reports," available at https://www.zdnet.com/article/web-hosting-providers-take-three-days-on-average-to-respond-to-abuse-reports/ dated Oct. 5, 2018.

Actual losses may include an award requiring a party found in contempt to reimburse the opposing party for costs and fees incurred as a result of the contempt. *See Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1111-12 (9th Cir. 2005) (affirming sanctions that "were compensatory in nature because they were designed to compensate [plaintiff] for unnecessary costs and attorney's fees."). Here, the Court should award Plaintiffs the attorneys' fees and costs associated with enforcing the Preliminary Injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

A.  Issue an Order requiring Dynadot to transfer the eth.link domain (the "Domain") to the registrar of Plaintiffs' choice.

B.  Order Dynadot to pay Plaintiffs their attorneys' fees and costs incurred in enforcing the Preliminary Injunction Order, in an amount to be determined in a subsequent submission, and hold Dynadot in contempt for violating the Court's Preliminary Injunction Order due to Dynadot violating Plaintiffs' ownership interests in the Domain through the following acts: (1) refusing to allow Plaintiffs to transfer the Domain to a new registrar without justification; (2) refusing to allow Plaintiffs to change any of the settings of the Domain's DNS configuration without justification; (3) suspending the Domain from operation without warning or justification; and (4) refusing to provide Plaintiffs with any assurances against future operational shut-downs without justification

C.  All other appropriate relief as determined by the Court.

| | |
|---|---|
| Dated: April 14, 2023 | CROWELL & MORING LLP |
| | By:   */s/ Katie Lee* |
| | Justin D. Kingsolver (AZ Bar No. 035476)<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004<br>Telephone: (202) 624-2500<br>JKingsolver@crowell.com |
| | CROWELL & MORING LLP<br>Alexander Urbelis (*pro hac vice*)<br>590 Madison Avenue, 20th Floor<br>New York, NY 10022<br>Telephone: (212) 223-4000<br>AUrbelis@crowell.com |
| | CROWELL & MORING LLP<br>Warrington S. Parker, III (*pro hac vice*)<br>Jacob Canter (*pro hac vice*)<br>Katie Lee (*pro hac vice*)<br>3 Embarcadero Center, 26th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 986-2800<br>WParker@crowell.com<br>JCanter@crowell.com<br>KatLee@crowell.com |