Kevin O'Malley (Bar No. 006420)
Yusra B. Bokhari (Bar No. 029376)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:    (602) 530-8500
kevin.omalley@gknet.com
yusra.bokhari@gknet.com
*Attorneys for Defendant Dynadot, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ENS Labs Ltd., *et al.*,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>GoDaddy Incorporated, *et al.*,<br><br>　　　　　　　Defendants. | No. 2:22-CV-01494-JJT<br><br>**DYNADOT LLC'S RESPONSE IN OBJECTION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION AND REQUEST TO CLARIFY OR AMEND THE PRELIMINARY INJUNCTION** |

Defendant Dynadot, LLC ("Dynadot"), by and through undersigned counsel, hereby files its Response in Objection to Plaintiffs' Motion to Enforce Preliminary Injunction and respectfully requests that the Court deny Plaintiffs' Motion to Enforce Preliminary Injunction [Dkt. 65.]  If granted, the relief sought by Plaintiffs in their motion to enforce, would prematurely end the case before the Court could issue a final ruling.

This case involves a dispute between Plaintiffs and Manifold Finance, Inc. ("Manifold") over the ownership of the eth[.]link domain name (the "Domain").  Dynadot does not have a stake in that dispute – it is not claiming any ownership over the Domain. Dynadot is simply the auction house that facilitated the sale of the domain name and is the current registrar of the Domain.

The Court held a hearing on Plaintiff's Ex Parte Motion for Preliminary Injunction on September 9, 2022.  [Dkt. 2.]  None of the Defendants were present.  Indeed, Dynadot had been served only two days prior, on September 7.  At the conclusion of the September

9538651v1/41238-0001

9 hearing, the Court issued an order enjoining Defendants "from selling or otherwise transferring ownership interest in the Domain" and requiring Defendants to "immediately transfer ownership in the Domain back to Plaintiffs." [Dkt. 19 at 4.]

Dynadot understands the Court's September 9 Order to transfer all of the operational rights of ownership to Plaintiffs as registrants. Dynadot did so. After the Court entered its September 9 Order, Plaintiffs created an account on Dynadot's registrar platform and on September 15, 2022, Plaintiffs accepted Dynadot's Terms of Use ("TOU").

Plaintiffs now assert that beyond all the operational ownership rights they have received, they should also be allowed to transfer the Domain to another registrar of their choosing. But this would create a serious risk that Plaintiffs could effectively end the case by transferring to a registrar outside of the Court's jurisdiction. The only restriction upon the Domain is a lock that is consistently used in domain ownership disputes to preserve the status quo until a final decision on the merits of the ownership dispute can be reached. Interpreting the Court's September 9 Preliminary Injunction Order to prohibit a jurisdiction-preserving lock would be contrary to the preliminary nature of the ruling, as well as the nature of preliminary injunctions to maintain the status quo until a final decision is reached.

Moreover, the lock has been in place since September 2022. Plaintiffs now complain about a short period of outage that was taken while Dynadot investigated two abuse complaints alleging that the Domain was hosting phishing scams, consistent with Dynadot's obligation under the Internet Corporation for Assigned Names and Numbers ("ICANN")[1] rules to investigate abuse reports. Such downtime is explicitly contemplated and addressed in the TOU that Plaintiffs accepted on September 15, 2022.

---

[1] "Internet Corporation for Assigned Names and Numbers (ICANN) helps coordinate the Internet Assigned Numbers Authority (IANA) functions, which are key technical services critical to the continued operations of the Internet's underlying address book, the Domain Name System (DNS). The IANA functions include: (1) the coordination of the assignment of technical protocol parameters including the management of the address and routing parameter area (ARPA) top-level domain; (2) the administration of certain responsibilities associated with Internet DNS root zone management such as generic (gTLD) and country code (ccTLD) Top-Level Domains; (3) the allocation of Internet numbering resources; and (4) other services." (https://www.icann.org/resources/pages/welcome-2012-02-25-en) (accessed on May 13, 2023).

9338651v1/41238-0001

1   Furthermore, Plaintiffs' motion is premature given that motions to dismiss are pending before the Court. GoDaddy, Inc. and GoDaddy.com LLC (collectively referred to as the "GoDaddy Defendants") filed a motion to dismiss for failure to state a claim. [Dkts. 49, 50.] Defendant Manifold filed a motion to dismiss and vacate preliminary injunction for lack of personal jurisdiction. [Dkt. 37.] Both of these motions are fully briefed and pending before the Court; if granted, this dispute will be dismissed and referred to a more appropriate jurisdiction for disposition of this dispute.

The Court should deny Plaintiffs' motion in its entirety and clarify and/or modify the existing injunction to prevent Plaintiffs from transferring the Domain outside this Court's jurisdiction. Dynadot's opposition to Plaintiffs motion is supported by the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    Factual and Procedural Background.**

**A.    The Preliminary Injunction.**

The Complaint [Dkt. 1] was filed on September 5, 2022 along with an Ex Parte Motion for Temporary Restraining Order [Dkt. 2.] On September 6, 2022, the Court set a hearing on September 9, 2022 and ordered that defendants must be served prior to September 7, 2022 and file a response by September 8, 2022. [Dkt. 11.]

Dynadot's Vice President of Operations, David Archwamety – who is not a legal professional – was served in northern California on the afternoon of September 7, 2022. [Dkt. 15.] Unfortunately, the complaint package was not received by Dynadot's General Counsel in Canada until later the next day. Due to delays in relaying the complaint package to the appropriate individuals within the company, Dynadot missed the September 9, 2022 hearing. Unfortunately, none of the other defendants appeared at the September 9 hearing either.

9538651v1/41238-0001

At the conclusion of the September 9, 2022 hearing, the Court issued its Order [Dkt. 19] granting Plaintiffs requested preliminary injunctive relief, taking into account Defendants' failure to respond. In relevant part, hereto, the Order reads as follows:

> **IT IS FURTHER ORDERED** that Defendants GoDaddy, Inc., GoDaddy.com LLC, Dynadot LLC, and Manifold Finance, Inc. (collectively, "Defendants"), their officers, agents, directors, affiliates, servants, employees, and all persons acting in concert with them, are HEREBY ENJOINED from selling or otherwise transferring ownership interest in the Domain to any party or purchasing or accepting ownership interest in the Domain.
>
> **IT IS FURTHER ORDERED** that, to the extent ownership interest in the Domain has been sold or transferred away from Plaintiffs as the registrants, Defendants shall immediately transfer ownership in the Domain back to Plaintiffs.

[Dkt. 19 at 4].

**B.     In Compliance with the Injunction, Dynadot Transfers the Domain to Plaintiffs.**

Upon receiving the Order, Dynadot transferred the Domain to an account controlled by Plaintiffs' counsel on September 14, 2022. (Exhibit A – Declaration of Hallie Cao, ¶ 7).

On September 15, 2022, Plaintiffs' counsel, Alexander Urbelis, accepted Dynadot's Terms of Use ("TOU") on behalf of Plaintiffs. (Exhibit A – Declaration of Hallie Cao, ¶ 8).

Dynadot's TOU explicitly address outages necessary as a result of investigation of abuse reports or objectionable activity, including phishing. Specifically, the TOU provides:

> **3 General**
> …
> 3.4 The Services, the App and this website, including but not limited to information, forms and agreements within, are provided "**as is**", "**as available**" and all warranties, express or

implied, are disclaimed (including but not limited to the disclaimer of any implied warranties of merchantability and fitness for a particular purpose). This website, the App and the Services may contain bugs, errors, problems or other limitations. . . . **You understand and agree that Dynadot disclaims any loss or liability resulting from: (1) access delays or access interruptions to our web site or any Service; . . . (8) the development or interruption of Your website and any Service; . . . (15) any corrective action Dynadot may take on Your account or Services provided to You as a result of Your violation of any term of this Agreement**. . .

**7 Disputes**

. . .

7.3 Unless otherwise stated herein, **Dynadot may, in its sole and absolute discretion**:

. . .

c) **Delete, suspend, cancel, terminate, or otherwise interrupt any Service and/or Your account where such Service or account is used in connection with a morally objectionable activity**, including but not limited to spam, fraud, illegal activity, defamation, slander, harassment, obscenity, profanity, indecency, deceptive practices, tortuous behavior, racism, bigotry, hatred, vulgarity, invasion of privacy, impersonation, intellectual property infringement, trademark infringement, copyright infringement, counterfeiting, piracy, unsolicited bulk e-mailing, **phishing**, pharming use of botnets, malware, any harm or threat of harm to a third party or to Dynadot, any activity contrary to applicable law and any activity or material deemed objectionable by Dynadot, in its absolute and sole discretion ("Objectionable Use Activity");

d) **Delete, suspend, cancel, terminate, or otherwise interrupt any Service and/or Your account while investigating whether Your account is used in connection with any Objectionable Use Activity** . . .

Dynadot Terms of Use (https://www.dynadot.com/terms-of-use.html) (emphasis added).

(Exhibit A – Declaration of Hallie Cao, ¶ 8)

9538651v1/41238-0001

5

As an ICANN accredited domain registrar, Dynadot is obligated to follow the ICANN rules which require Dynadot to provide an abuse reporting and response service twenty-four hours a day, seven days a week.[2] (Exhibit A – Declaration of Hallie Cao, ¶ 13). *See also*, *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F.Supp. 22 856, 859 (N.D. Cal. 2012) (explaining the domain name system).

Section 3.18.1 of ICANN's Registration Accreditation Agreement provides that:

> **Registrar shall maintain an abuse contact to receive reports of abuse involving Registered Names sponsored by Registrar, including reports of Illegal Activity**. Registrar shall publish an email address to receive such reports on the home page of Registrar's website . . . **Registrar shall take reasonable and prompt steps to investigate and respond appropriately to any reports of abuse**.

(Emphasis added).

**C.    Dynadot Locks the Domain to Preserve the Status Quo Pending a Final Resolution of the Case.**

The Domain is in an account controlled by Plaintiffs. An auction lock was automatically activated on the Domain at the conclusion of the auction on September 3, 2022. (Exhibit A – Declaration of Hallie Cao, ¶ 5). The auction lock remains active for fifteen days and ensures payment of the auctioned domain name by preventing transfer to another registrar. (Exhibit A – Declaration of Hallie Cao, ¶ 5).

After September 9, 2022, Dynadot set the Domain account to a non-transferable state which would not automatically expire, pending resolution of the domain name ownership dispute. (Exhibit A – Declaration of Hallie Cao, ¶6). This setting essentially *locks the registrar* by prohibiting the registrant from transferring the domain name to a different registrar. An auction lock setting that does not automatically expires, is the same as the

---

[2] *See*, Section 3.18.2 of ICANN's 2013 Registrar Accreditation Agreement (https://www.icann.org/resources/pages/approved-with-specs-2013-09-17-en#whois) (accessed on May 10, 2023).

6

Uniform Domain Name Dispute Resolution Policy ("UDRP") lock, which has been codified by the ICANN under its dispute resolution policy known as the UDRP.

The UDRP lock is an administrative setting that a registrar can apply to a domain name, which prevents any modification to the registrant and registrar but does not affect the use or renewal of the domain name.[3] This setting is the most efficient way to set the domain name to a non-transferrable state. (Exhibit A – Declaration of Hallie Cao, ¶ 6). Neither the UDRP lock nor the auction lock affect the use or function of the domain name, nor is either lock visible to website users. (Exhibit A – Declaration of Hallie Cao, ¶¶ 10-11). It is however visible in the user-side panel. (Exhibit A – Declaration of Hallie Cao, ¶ 9).

To be clear, Dynadot has not placed any other restrictions over the Domain. Plaintiffs retain all operational ownership rights to the Domain. (Exhibit A – Declaration of Hallie Cao, ¶ 11).

Plaintiffs admit that they have known about the lock since at least December 2022. [Dkt. 65 at 4.] On December 13, 2022, Plaintiffs were advised that transfer restrictions were in place over the Domain, which is why they could see the "UDRP Lock" setting. (Exhibit B – Y. Bokhari, "TNL v. GoDaddy et al." email chain, January 17, 2023, 2). At the same time, Dynadot offered to change the name servers per Plaintiffs' request and explore a custom transfer lock for the Domain that would remove the UDRP Lock notice from the account page. (Exhibit B – Y. Bokhari, "TNL v. GoDaddy et al." email chain, January 17, 2023, 2; Exhibit A – Declaration of Hallie Cao, ¶ 12). Plaintiffs did not request to modify the account setting.

Instead, Plaintiffs waited until April 14, 2023 to file their motion.

---

[3] Section 1 of the UDRP rules define "Lock" as "a set of measures that a registrar applies to a domain name, which prevents at a minimum any modification to the registrant and registrar information by the Respondent, but does not affect the resolution of the domain name or the renewal of the domain name." *See*, Section 1, https://www.icann.org/resources/pages/udrp-rules-2015-03-11-en.

7

### D. The Service Interruption Was Necessary to Investigate Abuse Complaints as Permitted by Dynadot's TOU.

On March 27, 2023 and March 28, 2023, Dynadot received two abuse complaints alleging that the Domain was hosting phishing scams. (Exhibit A – Declaration of Hallie Cao, ¶¶ 14-15, Exhibits 1 and 2). In accordance with Dynadot's abuse response process, the Domain was flagged in the database as suspicious and marked for further investigation. (Exhibit A – Declaration of Hallie Cao, ¶¶ 15-16). The TornadoCash platform received heightened review as it was a name match to current sanctions imposed by the Department of Treasury, Office of Foreign Asset Control ("OFAC").[4]  (*See also*, Exhibit A – Declaration of Hallie Cao, ¶ 16, Exhibit 2).

Due to these flags, Dynadot's customer service agent turned off the Domain's name server ("NS"), disabling it on March 29 at 7:22 EST. (Exhibit A – Declaration of Hallie Cao, ¶ 17). Next, a senior customer service agent reviewed the initial response to the abuse report and reversed the remedial action by restoring the Domain on March 29, 2023 at 9:07 EST.[5]  (**Exhibit A** – Declaration of Hallie Cao, ¶ 18).

Dynadot's response to the complaints was within the scope of its TOU and the ICANN rules. Dynadot's measures to avoid any OFAC violations is reasonable as they can have undesirable consequences.

### II. The September 9 Order Should Not Be Interpreted to Allow Plaintiffs to Moot the Case.

The Order provides that "to the extent ownership interest in the Domain has been sold or transferred away from **Plaintiffs as the registrants**, Defendants shall immediately transfer ownership in the Domain back to Plaintiffs." (Emphasis added). [Dkt. 19 at 4.]

---

[4] *See*, U.S. Department of the Treasury, "U.S. Treasury Sanctions Notorious Virtual Currency Mixer Tornado Cash" August 8, 2022 (https://home.treasury.gov/news/press-releases/jy0916) (accessed on May 10, 2023).

[5] The parties do not agree as to the exact length of the downtime – Plaintiffs state the domain name was offline for approximately six and a half hours and Dynadot's position is that the domain name was offline for approximately one hour and forty-five minutes.

9538651v1/41238-0001

8

Dynadot has interpreted the Order as giving Plaintiffs ownership and control over the Domain, consistent with the ownership rights of any other registrant, while Dynadot remains the Domain's registrar pending resolution of the underlying ownership dispute amongst the other parties.

To reiterate, Dynadot does not have a proverbial *dog in the fight* as it is not contending that it has an ownership interest in the Domain. Dynadot is the current registrar of the Domain and oversaw the auction of the same. While Dynadot does not assert any ownership interest in the Domain, it does have a duty to "maintain the status quo during a domain name dispute." *Petroliam*, 897 F.Supp. 22 at 861 (holding that UDRP policy requires registrars to maintain status quo during domain name disputes). If granted, Plaintiffs' proposal would leave Dynadot and the other defendants without any mechanism for resolution of the ownership dispute, including commissions owed to Dynadot.

Plaintiffs assert that the September 9 Order should be interpreted to allow them to transfer the domain name to another registrar – even one that may be outside of the country. Plaintiffs have made it clear that they "intend to transfer eth[.]link to our own registrar." (Exhibit B – Y. Bokhari, "TNL v. GoDaddy et al." email chain, January 17, 2023, 1). If the Court permits Plaintiffs to transfer the Domain to a different registrar during the pendency of this litigation, Plaintiffs can transfer the Domain outside this Court's jurisdiction, rendering this litigation moot. Of course, this would be inconsistent with the intentions of a preliminary injunction, which is designed to preserve the status quo prior to a final judgment being entered in the matter. *See*, *Cerelux Ltd. v. Yue Shao*, 2017 WL 4769445 at *9 (C.D. Cal. May 3, 2017) (the court ordered a transfer restriction to stay in place and explained that transferring a domain outside of the court's jurisdiction would frustrate resolution of the action on the merits).

In this matter, no decision on the merits of the case has been made – in fact, parties are still contesting the Court's jurisdiction over this matter. As such, the preliminary

9538651v1/41238-0001

1  injunction should not be interpreted in a way that would render the case moot prior to a final
2  judgment.

3  Plaintiffs have raised the lock as an issue for the first time in the motion to enforce.
4  The auction lock was in place on September 9 but it was not brought to the Court's attention
5  at that time. The Court should now clarify what it intended in its September 9, 2022 Order.
6  "District courts have 'inherent authority' to not only clarify an injunction, but also 'to
7  modify a preliminary injunction in consideration of new facts.'" *Tribal Behavioral Health*
8  *LLC v. Reeves*, 2023 WL 183677 *1 (D. Ariz. Jan. 13, 2023) (citing to *A&M Records, Inc.*
9  *v. Napster*, 284 F.3d 1091, 1098 (9th Cir. 2002)).

10  **III.  The Lock Is Necessary to Preserve the Status Quo and Does Not Disrupt**
11  **Plaintiffs' Operational Ownership Rights.**

12  As discussed above, the administrative setting on the Domain prevents any
13  modification to the registrant and registrar but does not affect the resolution of the domain
14  name or the renewal of the domain name. Furthermore, it does not affect the use or function
15  of the domain name, nor is it visible to non-party users.

16  **A.  The Lock Is Not Exclusive to ICANN Administrative Proceedings.**

17  Plaintiffs incorrectly argue that Dynadot can only use the "UDRP Lock" setting
18  during an ICANN or UDRP administrative proceeding. [Dkt. 65 at 4]. While the ICANN
19  rules explicitly allow for a lock during the pendency of a UDRP proceeding, they do not
20  state that such a lock is exclusive to UDRP proceedings or that that the same lock may not
21  be used in any other instances or proceedings. *See* UDRP Rule ¶ 4.

22  To the contrary, the UDRP lock setting can be used in judicial proceedings over
23  domain name disputes. Courts have heard and decided domain name disputes while
24  applying the ICANN and UDRP arbitration policies. *Cerelux*, 2017 WL 4769445 at 6. To
25  that end, the *Cerelux* court permitted a transfer lock to remain in place during the judicial
26  process. *Id*. At *9. Indeed, in *Dent v. Lotto Sport Italia*, 2020 WL 1170840 (D. Ariz. Mar.

9538651v1/41238-0001

10

11, 2020), a cybersquatting case cited by Plaintiffs, the court permitted a lock during the litigation and only ordered the lock to be lifted **after** ruling on the merits of the case, i.e. granting plaintiff's motion for summary judgment.

Dynadot's position is consistent with the precedent whereby the lock should remain until the conclusion of the underlying litigation.

### B. No Court Has Held that a Lock Disrupts Ownership Rights in a Case Involving a Preliminary Injunction.

Plaintiffs cite multiple cases in support of their position that the transfer restriction is violating their basic ownership rights. But none of these cases are on point. For example, *Leo India Films Ltd. v. GoDaddy.com LLC*, 2022 WL 83612 at *2 (D. Ariz. Mar. 21, 2022), merely found that the plaintiff's claim for breach of the implied covenant of good faith and fair dealing regarding a lock survived a motion to dismiss. The *Dent* finding is also distinct, as the court ordered the domain name to be unlocked to transfer only **after** ruling on motions for summary judgment and making a final determination of ownership. Plaintiffs have not cited to any authority which supports the relief they are requesting.

In fact, "[t]he purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered." *Ariz. Recovery Hous. Ass'n v. Ariz. Dep't Health Servs.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020); *see also*, *Shaka v. Ryan*, 2014 WL 4977679 *1 (October 3, 2014). As such, the Court should deny Plaintiffs' motion and clarify the preliminary injunction to permitting the lock to remain in place until a final judgment is rendered.

## IV. Service Interruptions to Investigate Abuse Reports Do Not Violate the Injunction.

Finally, Plaintiffs assert that Dynadot violated the injunction, harmed Plaintiffs, and compromised their "ownership interest" due to the Domain being offline for a couple of hours. [Dkt. 65 at 5-8, 10-11.] Although the Domain did experience an outage or downtime

for approximately one hour and forty-five minutes, this did not infringe upon Plaintiffs' ownership rights over the Domain as registrants, as an interruption is permissible under Dynadot's TOU and was necessary while Dynadot investigated two abuse reports.

As noted above, Plaintiffs accepted Dynadot's TOU in September 2022. By accepting and agreeing to Dynadot's TOU, a contract was formed between Plaintiffs and Dynadot. *Hines v. Oversotck.com, Inc.*, 668 F.Supp.2d 362, 366 (E.D. NY, Sept. 8, 2009). On the internet, a contract is formed when a website user "typically click[s] an 'I agree' box after being presented with a lest of terms and conditions of use." *Id.* (Exhibit A – Declaration of Hallie Cao, ¶ 8).

Under these circumstances, Plaintiffs would not have had any different outcome or use of the Domain with a different registrar. Even if another registrar could guarantee no suspensions or outages (a highly doubtful proposition), they are not free to ignore ICANN, which requires registrars to provide an abuse reporting service and to "take reasonable and prompt steps to investigate and respond appropriately to any reports of abuse."[6] Dynadot obviously is not free to ignore sanctions and warnings imposed by OFAC or the federal government.

## V. Plaintiffs Are Not Entitled to Compensatory Sanctions.

Plaintiffs request for compensatory sanctions must be denied as they have not shown that Dynadot violated the September 9. "A court may issue an order of civil contempt against a party that 'fail[ed] to take all reasonable steps within the party's power to comply' with a specific and definite court order." *MVC Techs. USA Inc. v. Kendrick*, 2019 WL 9598365 *1 (D. Ariz. Oct. 15, 2019). "[S]anctions for civil contempt are intended to coerce the contemnor to comply with the Court's order and remedy the party who has suffered as a result of contemnor's transgressions." *Id.* *5. (citing to *Lasar v. Ford Motor Co.*, 399

---

[6] *See*, Section 3.18.2 of ICANN's 2013 Registrar Accreditation Agreement (https://www.icann.org/resources/pages/approved-with-specs-2013-09-17-en#whois) (accessed on May 10, 2023).

F.3d 1101, 1110; *Fed. Trade Comm'n v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1112 (C.D. Cal. 2001)).

As discussed above, Dynadot has complied with the Court's orders, including the preliminary injunction, and all contractual obligations to Plaintiffs. The only restriction upon the Domain is a setting that prevents transfer of the Domain outside of the jurisdiction of this Court until the ownership dispute is resolved.

## VI. Conclusion.

Based on the foregoing, the Court should deny Plaintiffs' motion in its entirety and clarify or modify the preliminary injunction to make it clear that Plaintiffs are not permitted to transfer the Domain pending a final, on the merits, resolution of this dispute. Dynadot also respectfully requests an award for its attorneys' fees and costs incurred in responding to Plaintiffs' motion.

DATED this 15th day of May, 2023.

GALLAGHER & KENNEDY, P.A.


By: */s/ Yusra B. Bokhari*
Kevin E. O'Malley
Yusra B. Bokhari
2575 East Camelback Road
Phoenix, Arizona 85016-9225
*Attorneys for Defendant Dynadot, LLC*

9538651v1/41238-0001

## CERTIFICATE OF SERVICE

I certify that on this 15th day of May 2023, a PDF copy of the foregoing was electronically transmitted to the Clerk of the Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Rona L. Miller*

9538651v1/41238-0001